UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ARELY WESTLEY a/k/a WILSON
AMILCAR VELASQUEZ-CABALLERO

VERSUS

MELLISSA B. HARPER, *et al.*

CIVIL ACTION

NO. 25-229

SECTION M (4)

### ORDER & REASONS

Before the Court is a motion for preliminary injunction filed by petitioner Arely Westley a/k/a Wilson Amilcar Velazquez-Caballero ("Petitioner") seeking a stay of her imminent deportation, a release from detention, and a declaration that the United States Immigration and Customs Enforcement ("ICE") violated her constitutional rights when it detained her on February 1, 2025.[1] Respondents Mellissa B Harper, in her official capacity as field office director of the New Orleans ICE field office; Scott Ladwig, in his official capacity as deputy field office director of the New Orleans ICE field office; Kristi Noem, in her official capacity as the Secretary of the United States Department of Homeland Security ("DHS"); the DHS; and ICE (collectively, "Respondents") oppose the motion, arguing that this Court lacks jurisdiction over all of Petitioner's claims because they stem from the execution of a final order of removal and that Petitioner is not otherwise entitled to a preliminary injunction.[2] Petitioner replies in further support of the motion, contending that this Court has jurisdiction over her "very narrow claims" regarding the constitutionality of her arrest and the revocation of her order of supervision.[3]

---

[1] R. Doc. 2.
[2] R. Doc. 20.
[3] R. Doc. 24. Petitioner says in her reply that she seeks only release from detention, not a stay of her removal, because Respondents have assured her that deportation is not imminent. *Id.* at 8 n.10.

On Saturday, February 1, 2025, the Court held a telephone hearing on Petitioner's motion for a temporary restraining order ("TRO"), whereupon the Court granted the TRO, prohibiting Respondents from (a) attempting to remove Petitioner from the Eastern District of Louisiana to any location outside of this district, and (b) removing Petitioner from the United States.[4] The TRO was entered to preserve the status quo while the parties briefed the issues more fully, particularly the concern the Court expressed during the hearing about its jurisdiction over the case. Thus, in the order, the Court also established a briefing schedule for Petitioner's preliminary injunction motion and set a hybrid Zoom/in-person preliminary injunction hearing for Wednesday, February 5, 2025.[5] On February 3, 2025, the parties filed a joint motion to extend the TRO and continue the evidentiary hearing and briefing deadlines.[6] The Court granted the motion, extending the TRO and rescheduling the evidentiary hearing to February 12, 2025, as requested.[7] The Court held the rescheduled evidentiary hearing on that date.[8] Thereafter, the parties filed post-hearing memoranda in further support of their respective positions.[9]

Now, having considered the parties' memoranda, the evidence and arguments presented at the hearing, the record, and the applicable law, the Court issues this Order & Reasons denying Petitioner's preliminary injunction motion, dissolving the TRO, and dismissing the case for lack of jurisdiction.

I.     BACKGROUND

This case concerns the impending deportation of an illegal alien who has a pending "T visa" application.[10] Petitioner is a 32-year-old transgender woman, who is a citizen and national

---

[4] R. Docs. 6; 7.
[5] *Id.*
[6] R. Doc. 13.
[7] R. Doc. 15.
[8] R. Doc. 27.
[9] R. Docs. 29; 30.
[10] R. Doc. 1.

of Honduras and a long-time resident of New Orleans, Louisiana.[11]  She has lived in the United States intermittently since age 11, and is purportedly a survivor of sex trafficking.[12]  On June 3, 2010, an immigration judge located in Oakdale, Louisiana, ordered that Petitioner be removed from the United States pursuant to removal proceedings that commenced on April 1, 1997.[13]  On June 24, 2010, Petitioner was removed to Honduras.[14]

Sometime thereafter, she reentered the United States without being admitted or inspected by an immigration officer.[15]  On February 2, 2012, Petitioner was convicted in Louisiana state court of simple burglary of an inhabited dwelling and possession of stolen things.[16]  On March 1, 2012, Petitioner reentered ICE custody and was issued a notice of intent to reinstate her prior removal order.[17]  On March 23, 2012, she was again removed to Honduras.[18]

Once again, Petitioner reentered the United States without being admitted or inspected by an immigration officer.[19]  From 2014 to 2024, Petitioner was convicted of various crimes in Louisiana courts, including simple burglary of an inhabited dwelling, bank fraud, theft, forgery, driving while intoxicated, and other traffic violations.[20]

On July 6, 2024, Petitioner was arrested for several traffic violations and taken into ICE custody on an immigration detainer.[21]  ICE was processing Petitioner for removal when Petitioner's then-attorney informed ICE that Petitioner had recently undergone gender affirmation

---

[11] *Id.* at 6, 8.
[12] *Id.*
[13] *Id.* at 2.
[14] R. Doc. 20 at 2.
[15] *Id.*
[16] *Id.* at 2-3.
[17] *Id.* at 3.
[18] *Id.*
[19] *Id.*
[20] *Id.* at 3-5.
[21] *Id.* at 5.

surgery that required daily post-surgical therapies that could not be completed in ICE custody.[22] As a result, ICE released Petitioner, pending deportation, pursuant to the conditions of an Order of Supervision ("OSUP"), which included an ankle monitor.[23] Petitioner says that she was fully compliant with the OSUP and all reporting requirements.[24]

On January 10, 2025, Petitioner applied for a "T visa," which is a form of immigration relief for noncitizen victims of human trafficking in the United States that provides a pathway to lawful permanent residency.[25] On January 24, 2025, Petitioner received a text message from her ICE supervision officer that said:

> Please send me a photo of any documents you have such as a passport, birth certificate etc. I am going to schedule you to be transferred to the Msite which is less supervision. Please come on February 1, 2025 at 8am. We are scheduling a group of people so please arrive early so you won't have to wait. Thank you![26]

When Petitioner appeared at the ICE office on February 1, 2025, ICE detained her and began processing her for removal to Honduras.[27] ICE also began the process of coordinating with United States Citizenship and Immigration Services for a "reasonable fear" interview because she expressed fear of being returned to Honduras.[28]

On February 1, 2025, Petitioner filed this action under this Court's habeas corpus (28 U.S.C. § 2241) and federal question (28 U.S.C. § 1331) jurisdiction.[29] She alleges that the sudden detention violated her Fifth Amendment right to procedural due process because ICE did not comply with federal regulations and there was no individualized review of her circumstances

---

[22] R. Docs. 30-1 at 1; 30-3 at 1.
[23] R. Docs. 20 at 5; 30-1 at 1-2.
[24] R. Doc. 1 at 2.
[25] R. Docs. 2-1 at 3; 20 at 18.
[26] R. Doc. 1-2 at 2.
[27] R. Doc. 20 at 5.
[28] *Id.*
[29] R. Doc. 1 at 7-8.

4

before her OSUP was revoked.[30] Petitioner also alleges that, under the Administrative Procedures Act ("APA), the Court must review ICE's revocation of her OSUP because the revocation was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.[31] Particularly, Petitioner argues that it would be an abuse of discretion to deport her before her "T visa" application is processed because she would be ineligible for that visa if she were no longer in the United States.[32] In that vein, Petitioner contends that she has a protected due process interest in having her visa application adjudicated and to remain in the United States, ultimately receiving lawful permanent resident status.[33] Finally, Petitioner alleges that ICE used a "ruse" in the text message to take her into custody in violation of the Fourth Amendment because there were no exigent circumstances since she had previously followed the OSUP's conditions and attended all appointments.[34] In the petition, Petitioner seeks a stay of her removal or transfer outside of the jurisdiction of this Court and the United States; a declaration that her detention violates the Immigration and Naturalization Act ("INA") and the due process clause of the Fifth Amendment; a declaration that she was unlawfully detained in violation of the Fourth Amendment; a declaration that her deportation prior to the full adjudication of her "T visa" application would violate the due process clause of the Fifth Amendment, the Trafficking Victims Protection Act, the INA, the APA, and federal regulations; an order for her immediate release or, alternatively, a constitutionally adequate, individualized hearing before a neutral decisionmaker in which Respondents bear the burden of establishing that her continued detention is justified; an order staying her removal until

---

[30] *Id.* at 9-16.
[31] *Id.* at 11-12, 16-18.
[32] *Id.* at 12-14, 16-18.
[33] *Id.* at 13.
[34] *Id.* at 14, 18-19.

5

her "T visa" application is fully adjudicated, including administrative appeals; and an award of costs and reasonable attorney's fees.[35]

Petitioner accompanied her petition with a motion for a TRO and preliminary injunction.[36] On Saturday, February 1, 2025, after conducting a telephone hearing, the Court issued a TRO that prohibits Respondents from (a) attempting to remove Petitioner from the Eastern District of Louisiana to any location outside of this district, and (b) removing Petitioner from the United States.[37] The TRO was issued on an emergency basis to preserve the status quo while affording adequate time for Respondents to respond and for the Court to more fully review the matter, including its jurisdiction.

Respondents timely filed an opposition to Petitioner's preliminary injunction in which they argue that this Court lacks subject-matter jurisdiction because all of Petitioner's claims arise from the decision to execute the final order of removal.[38] They also argue that Petitioner's claims fail on the merits because habeas relief is not available to stay removal, ICE lawfully detained Petitioner, and her T-visa application does not afford her with any rights to stop removal.[39] Finally, Respondents argue that Petitioner cannot satisfy the irreparable harm, balance of equities, or public interest prongs of the preliminary injunction test.[40]

In her reply memorandum, at the preliminary injunction hearing, and in her post-hearing memorandum, Petitioner admitted that her claims have changed.[41] Petitioner now states that her habeas petition challenges only the constitutionality of her detention and the method used to effect

---

[35] *Id.* at 19-20.
[36] R. Doc. 2.
[37] R. Docs. 6; 7.
[38] R. Doc. 20 at 7-13.
[39] *Id.* at 13-21.
[40] *Id.* at 21-24.
[41] R. Docs. 24 at 2; 29 at 2 n.1.

6

it.[42] At this time, she seeks (1) "simple release" from the February 1, 2025 detention, and (2) a declaration that ICE violated her constitutional rights on that day by securing her appearance with a ruse and failing to follow proper procedures to revoke her OSUP and detain her.[43] Petitioner no longer asks this Court to stay her removal from the United States.[44]

## II.     LAW & ANALYSIS

### A. Legal Backdrop

This case involves an alien who has twice previously been removed from the United States under a final order of removal and has reentered the country unlawfully yet again. The following recitation explains the legal backdrop against which Petitioner's claims must be viewed.

Pursuant to 8 U.S.C. § 1231(a)(5), if DHS finds that "an alien has reentered the United States illegally after having been removed … under an order of removal, the prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed." DHS may effectuate removal "at any time" under the prior order. And the alien "is not eligible and may not apply for any relief."

The statute contemplates that removal will occur within 90 days of the later of three possible dates. 8 U.S.C. § 1231(a)(1)(A)-(B). If the alien is not removed within the 90-day removal period, he or she "shall be released pursuant to an order of supervision" that imposes certain conditions. 8 C.F.R. § 241.5(a). But the government may revoke the order of supervision under certain circumstances. *Id*. § 241.4(*l*). Subsection 241.4(*l*)(2) permits the government to terminate supervision if, in the opinion of the ICE district director, "revocation is in the public interest and circumstances do not reasonably permit referral of the case to the Executive Associate

---

[42] *Id.*
[43] *Id*.
[44] *Id.* at 9.

Commissioner" or when the revoking official finds one of the following: "(i) [t]he purposes of release have been served; (ii) [t]he alien violates any condition of release; (iii) [i]t is appropriate to enforce a removal order or to commence removal proceedings against an alien; or (iv) [t]he conduct of the alien, or any other circumstance, indicates that release would no longer be appropriate." *Id.* § 241.4(*l*)(2). In turn, the possibility of "prompt removal" suspends the custody review process that the regulation otherwise requires. *Id.* § 241.4(k)(3).

### B. Jurisdiction

Petitioner filed this case citing various potential sources of subject-matter jurisdiction, namely, 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 2241 (habeas corpus), 28 U.S.C. § 1651 (All Writs Act), the INA, the APA, and the Fourth and Fifth Amendments.[45] Respondents contend that this Court lacks subject-matter jurisdiction pursuant to 8 U.S.C. § 1252(g), because Petitioner's claims "arise from" ICE's execution of Petitioner's reinstated final order of removal.[46] In response, Petitioner argues that her claims fall outside of § 1252(g), because she challenges only the constitutionality of the detention itself and the method ICE used to make the arrest, but does not challenge ICE's decision to detain her or the legality or execution of the final order of removal.[47] And thus, says Petitioner, this Court has jurisdiction to entertain her habeas claims.[48] The Court agrees with Respondents.

The subject-matter jurisdiction of federal courts is limited. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). "They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree." *Id.* (internal citations omitted). The

---

[45] R. Doc. 1 at 7.
[46] R. Docs. 20 at 7-13; 30 at 4-6.
[47] R. Docs. 24 at 5-10; 29 at 3-7.
[48] *Id.*

Illegal Immigration Reform and Immigration Responsibility Act of 1996 provides, in pertinent part:

> Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

8 U.S.C. § 1252(g) (as codified).  The Supreme Court has explained that § 1252(g) "applies only to three discrete actions that the Attorney General may take: her 'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'" *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482 (1999) (emphasis in original).  Thus, by its explicit terms, § 1252(g) strips this Court of subject-matter jurisdiction – whether invoked by habeas petition, under the All Writs Act, or under any other statutory or nonstatutory provision of law – to review claims "arising from" a decision or action to execute a removal order against an alien.  *Id.*; 8 U.S.C. § 1252(g).

      Clearly then, the key injunctive relief prayed for in the petition and motion – specifically, a stay of Petitioner's removal from the United States in general and an order staying her removal until her T-visa application is fully adjudicated – falls outside of this Court's jurisdiction.  *See Idokogi v. Ashcroft*, 66 F. App'x 526, at *1 (5th Cir. 2003) (holding that the district court lacked jurisdiction to stay deportation of an alien because the relief was connected "'directly and immediately' with the Attorney General's decision to commence removal proceedings against him").  Petitioner concedes as much by morphing her claims to focus on the detention and the method of arrest.  Because this Court lacks jurisdiction to stay the execution of the removal order, those claims are dismissed, and the TRO must be dissolved.

9

So, the question now is whether Petitioner's current claims regarding the constitutionality of the revocation of the OSUP, her subsequent detention, and the method of arrest, *i.e.*, the alleged "ruse" used to illicit her appearance, "arise from" the decision to execute the removal order. Under the facts of this case, they undoubtedly do. Here, ICE took these actions as a necessary prelude to securing Petitioner for her removal. In *Foster v. Townsley*, 243 F.3d 210, 214 (5th Cir. 2010), the Fifth Circuit held that § 1252(g) precluded the district court from exercising jurisdiction over an immigrant petitioner's claims of excessive force, denial of due process, denial of equal protection, and retaliation that all allegedly occurred in the arrest and detention process because they were "all directly connected" to the execution of a removal order. *See also Lopez v. Prendes*, 2012 WL 3024209, at *1-2 (N.D. Tex. June 27, 2012) (holding that ICE's alleged ruse used to gain entry to plaintiffs' home was "directly and immediately connected" to the removal process), *adopted*, 2012 WL 3024750 (N.D. Tex. July 24, 2012). Petitioner's remaining claims meet the same end.

In an attempt to salvage jurisdiction over the claims, Petitioner argues that ICE was not executing a removal order on February 1, 2025, but rather initiating proceedings to reinstate one.[49] According to Petitioner, ICE did not, and could not, have a date-certain for her removal because she was entitled to a "reasonable fear interview" after she raised those claims when she was detained.[50] This necessarily entailed a process that would delay her removal, and thus, says Petitioner, the arrest and detention could not have been part of the execution of a removal order.[51]

Petitioner's assertions are belied by the record. In his declarations, ICE field officer David Raynes attests that sometime within the last month or so (six months after Petitioner was placed on supervision), ICE reviewed Petitioner's file and determined that the purposes of the OSUP –

---

[49] R. Docs. 24 at 5-7; 29 at 3-7.
[50] *Id*.
[51] *Id*.

namely, caring for Petitioner's post-surgical medical needs – had been served, to ICE's knowledge, and it was now appropriate to enforce the June 3, 2010 removal order.[52] To that end, on February 1, 2025, the deputy field office director approved the revocation of Petitioner's OSUP, and the supervisory detention and deportation officer signed a warrant of removal.[53] Accordingly, on February 1, 2025, ICE issued a warrant of removal stating that Petitioner would be removed based on a final order of removal issued by an immigration judge that was in her file, *viz.*, the June 3, 2010 removal order.[54] ICE also issued a notice of custody determination stating that Petitioner would be detained.[55] Raynes further attested that ICE detained Petitioner and started processing her for removal.[56] That processing included coordinating with the United States Citizenship and Immigration Services for a "reasonable fear interview" after Petitioner, upon detention, expressed fear of return to Honduras.[57] Once Petitioner is afforded the process due for the fear hearing, there is "a significant likelihood of removal in the reasonably foreseeable future" because she has twice been removed to Honduras, a country that allows for the expeditious return of its nationals.[58] These facts show that ICE called Petitioner to its office,[59] revoked the OSUP, and detained her as necessary steps in securing her to effectuate the final order of removal. Thus, Petitioner's claims regarding these events are inextricably intertwined with and "arise from" the decision to execute the removal order, and by virtue of § 1252(g), this Court lacks jurisdiction over those claims.

---

[52] R. Docs. 20-1 at 5; 30-1 at 1-2.
[53] R. Doc. 30-1 at 2.
[54] R. Doc. 20-2 at 3, 33.
[55] *Id.* at 5.
[56] R. Docs. 20-1 at 5; 30-1 at 2.
[57] R. Doc. 20-1 at 5.
[58] *Id.* Petitioner argues, however, that the need to conduct a fear interview eliminates the imminence of her removal and, consequently, the application of § 1252(g)'s jurisdictional bar. R. Doc. 29 at 6-7. But a court's jurisdiction cannot be so malleable as would allow a petitioner, upon realizing that she has pleaded herself outside of the court's jurisdiction, to cause it to spring back into existence simply by raising a fear concern. A federal court's jurisdiction is limited, not elastic. In making this point, the Court is in no way discounting Petitioner's claim of fear here, but it is concerned that any different reading of § 1252(g) might make this stratagem a tempting avenue for others.
[59] R. Doc. 30-1 at 2.

Petitioner also tries to save the claims by relying on *Jennings v. Rodriguez*, 583 U.S. 281 (2018), and *Zadvydas v. Davis*, 533 U.S. 678 (2001), for the proposition that habeas challenges to immigrant detention are not precluded by § 1252(g).[60] But both of those cases are factually distinguishable and thus do not govern here.

In *Jennings*, the habeas petitioner, who was detained while he appealed an immigration judge's order of removal, alleged that he was entitled to a bond hearing to determine if continued detention was justified. 583 U.S. at 289-90. A plurality of the Supreme Court, noting that petitioner did not challenge the decision to detain or seek removal, nor any part of the process by which removability would be determined, held that the petitioner's claim, which related to prolonged detention pending the final determination of removability (*i.e.*, before any final order of removal was even issued), was not barred by § 1252(g). *Id.* at 293-94. *Zadvydas* involved habeas petitions filed by detained aliens who were subject to final removal orders, but removal was not reasonably foreseeable because there was no country willing to accept them. 533 U.S. at 682-84. The Supreme Court held that such prolonged detention habeas claims were not covered by § 1252(g)'s jurisdictional bar because an alien's detention following issuance of a removal order should be limited "to a period reasonably necessary to bring about that alien's removal from the United States" and "does not permit indefinite detention." *Id.* at 688-89.

Here, Petitioner was the subject of a final order of removal, and ICE called her to its office, revoked the OSUP, and detained her with the intent to execute that order and the belief that removal would occur in the reasonably foreseeable future. There was no actual or contemplated prolonged detention. ICE intended to detain and deport Petitioner as soon as possible. Admittedly, the period of detention would be extended once Petitioner raised fear concerns in order to allow the fear

---

[60] R. Doc. 24 at 7-10.

12

hearing process to occur. However, Respondents' attorney represented that it is an expedited, not prolonged, process.[61] In these essential respects, Petitioner's situation is distinguishable from the circumstances faced by the habeas petitioners in *Jennings* and *Zadvydas*. Thus, these cases do not support this Court's jurisdiction over Petitioner's claims.

Moreover, Petitioner's other jurisdictional predicates do not save her claims. Section 1252(g) states that no court shall have jurisdiction over claims arising from the execution of a removal order, notwithstanding any provision of statutory or nonstatutory law. 8 U.S.C. § 1252(g). Because this Court has determined that all of Petitioner's claims arise from the decision to execute a removal order, it lacks jurisdiction to entertain them under any provision cited by Petitioner. *See, e.g., Berhane v. Prendis*, 2004 WL 2348226, at *3 (N.D. Tex. Oct. 18, 2004) (explaining that no general jurisdiction provisions, including the APA, federal question, the Declaratory Judgment Act, the All Writs Act, the mandamus provision, the suspension clause, or common law gives a federal district court jurisdiction over a petitioner's claims arising from the execution of a final order of removal), *adopted*, 2004 WL 2624260 (N.D. Tex. Nov. 12, 2004).

### C. Merits of the Preliminary Injunction Motion

Even if this Court had jurisdiction over Petitioner's claims, which it does not, she fails to satisfy the elements required to secure a preliminary injunction. There is no likelihood of success on the merits, no irreparable harm, and the merged threat-of-injury-versus-potential-harm and public interest analysis favors Respondents.

A movant seeking a preliminary injunction must establish (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) that the threatened injury to the movant if the injunction is denied outweighs the potential harm

---

[61] At some point, the actual detention may become prolonged so that a habeas claim would not be barred by § 1252(g). But that has not come to pass and is not before this Court.

to the nonmovant if the injunction is granted; and (4) that granting the injunction will not disserve the public interest. *Garcia v. Jones*, 910 F.3d 188, 190 (5th Cir. 2018). "A preliminary injunction is an extraordinary remedy which courts grant only if the movant has clearly carried the burden as to all four elements." *Guy Carpenter & Co. v. Provenzale*, 334 F.3d 459, 464 (5th Cir. 2003). A preliminary injunction "may only be awarded upon a clear showing that the [movant] is entitled to such relief," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008), and is never awarded as a matter of right but only within the sound discretion of the district court. *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008); *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *see Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174, 1178 (5th Cir. 1989) ("The primary justification for granting a preliminary injunction is to preserve the court's ability to render a meaningful decision on the merits."). Ultimately, granting a preliminary injunction "is to be treated as the exception rather than the rule." *Miss. Power & Light Co.*, 760 F.2d at 621.

Generally, a party is not required to prove its case in full at a preliminary injunction hearing, so the evidence is often less complete than in a trial on the merits; and, because a federal court does not render a final judgment on the merits at the preliminary injunction stage, its findings of fact and conclusions of law are not binding at a trial on the merits. *Camenisch*, 451 U.S. at 395. "Furthermore, at the preliminary injunction stage, the procedures in the district court are less formal, and the district court may rely on otherwise inadmissible evidence, including hearsay evidence. Thus, the district court can accept evidence in the form of deposition transcripts and

14

affidavits." *Sierra Club, Lone Star Chapter v. FDIC*, 992 F.2d 545, 551 (5th Cir. 1993) (internal citation omitted).

Petitioner, as the movant, must establish the four factors necessary for the issuance of preliminary injunctive relief. The Court begins with whether Petitioner has a substantial likelihood of success on the merits of her claims against Respondents. "To show a likelihood of success, the [movant] must present a prima facie case, but need not prove that [s]he is entitled to summary judgment." *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013). A preliminary injunction should not issue if "the law on the question at the heart of the dispute does not favor [the movant's] position." *La Union Del Pueblo Entero v. FEMA*, 608 F.3d 217, 225 (5th Cir. 2010).

Petitioner's modified preliminary injunction motion seeks (1) "simple release" from the February 1, 2025 detention, and (2) a declaration that ICE violated her constitutional rights on that day by securing her appearance with a ruse and failing to follow proper procedures to revoke her OSUP and detain her. The release can only be ordered if indeed ICE violated Petitioner's constitutional rights on February 1, 2025, and it did not.

Petitioner's claims that ICE's illegal conduct began by using what she calls a "ruse" to entice her appearance. Petitioner claims that ICE, in its January 24, 2025 text message to her, falsely claimed that it was transferring her to a program with less supervision referred to as Msite in order to entice her to appear at its office on February 1, 2025, and arrest her without following proper procedures. This she claims was a "ruse" that is impermissible under the Fourth Amendment because, says Petitioner, there were no exigent circumstances, such as a risk of flight.

ICE, on the other hand, argues that there was no "ruse" because Petitioner was required to appear when asked, and even if there were, it was appropriate under the facts of the case. ICE

15

points out that exigent circumstances existed because Petitioner is the subject of a final order of removal, has twice previously been removed from the country, and has an extensive criminal record, and ICE is now prioritizing removal of aliens with criminal records. ICE also contends that it showed through Raynes's declarations that it indeed followed proper arrest procedures by procuring the appropriate documents, *i.e.*, the warrant and order of detention.

The Court agrees with Respondents. The Fifth Circuit has sanctioned the use of "ruses" and other deception by law enforcement when necessary. *United States v. Allibhai*, 939 F.2d 244, 251 (5th Cir. 1991) (quoting *United States v. Fera*, 616 F.2d 590, 596 (5th Cir.1980)). Here, even if Respondents used a ruse, the exigent circumstances they describe justified it. Thus, Petitioner cannot succeed on her Fourth Amendment claim.

Next, Petitioner argues that ICE failed to follow its own regulations, set forth in 8 C.F. R. § 241.4(*l*), in revoking the OSUP and detaining her.[62] First, Petitioner contends that there is no threshold basis for revocation – meaning there is no evidence of a determination that revocation was in the public interest and that the circumstances did not reasonably permit referral to the executive associate commissioner.[63] Next, Petitioner argues that none of the four justifications for revoking release listed in § 241.4(*l*)(2) existed because there is no evidence that the "medical reasons," of which she claims she is unaware, for issuing the OSUP were fulfilled.[64]

---

[62] Petitioner also cites the regulations at 8 C.F.R. § 241.13. R. Docs. 2-1 at 7-9; 24 at 13. But that provision, which concerns immigrant detainees for whom "there is no significant likelihood of removal … in the reasonably foreseeable future" because no country would accept them, is inapplicable here. 8 C.F.R. § 241.13(a); *see also Alam v. Nielsen*, 312 F. Supp. 3d 574, 581 (S.D. Tex. 2018) (applying § 241.4, and not § 241.13, when there was no indication that removal was not likely in the reasonably foreseeable future); *Rombot v. Souza*, 296 F. Supp. 3d 383, 387 (D. Mass. 2017) (same). There is no indication that Honduras would not accept Petitioner.

[63] R. Doc. 24 at 13-15. In her reply memorandum, Petitioner contends that the correct official did not revoke her OSUP. *Id.* at 13-14. But she admits that the titles referenced in the regulation are outdated, and she agrees in her post-hearing memorandum that the appropriate official – namely, Scott Ladwig, the deputy field office director – revoked her OSUP. R. Doc. 29 at 9.

[64] R. Doc. 24 at 13, 15.

Respondents demonstrated at the hearing and in their post-hearing memorandum, however, that ICE followed § 241.4(*l*) to lawfully revoke Petitioner's OSUP and detain her.  They showed that the appropriate officers were involved: deputy field office director Scott Ladwig approved the revocation of Petitioner's OSUP, and the supervisory detention and deportation officer signed the warrant of removal.[65]  They also explained that revocation was in the public interest because the public has an interest in the enforcement of lawfully issued removal orders, and §§ 241.4(*l*)(2)(i) and (iii) were satisfied because the purpose of the release under the OSUP (caring for Petitioner's medical condition) was served, to ICE's knowledge at the time, and it was appropriate to enforce the removal order.[66]  Thus, ICE followed its regulations in revoking the OSUP and detaining Petitioner in anticipation of removal, so she has no likelihood of success on the merits of her remaining claims.

To prevail on the second element for injunctive relief, the movant must show that the threat of injury is likely and irreparable.  *See Winter*, 555 U.S. at 22.  An injury is irreparable if it cannot be adequately compensated by money damages.  *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012).  Thus, "only those injuries that cannot be redressed by the application of a judicial remedy after a hearing on the merits can properly justify a preliminary injunction."  *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974).  Equitable relief is warranted when the injury constitutes "either continuing harm or a real and immediate threat of repeated injury in the future."  *Soc'y of Separationists, Inc. v. Herman*, 959 F.2d 1283, 1285 (5th Cir. 1992).  Petitioner says that the violation of her constitutional rights constitutes irreparable harm.  Because her rights were not violated, there is no irreparable harm.

---

[65] R. Docs. 30 at 2-4; 30-1 at 2.
[66] R. Docs. 30 at 2-3; 30-1 at 1-2.

Finally, the third and fourth prongs of the preliminary injunction inquiry, which involve "assessing the harm to the opposing party and weighing the public interest[,] merge when the [g]overnment is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). At bottom, this case is about the prompt execution of removal orders, and there is a strong public interest in ensuring that immigration laws are followed. *Id.* at 436 ("There is always a public interest in prompt execution of removal orders: The continued presence of an alien lawfully deemed removable undermines the streamlined removal proceedings [Congress] established, and permits and prolongs a continuing violation of United States law." (quotation and alterations omitted)). Thus, the third and fourth factors weigh against granting a preliminary injunction.

In sum, even if the Court had jurisdiction over this case, Petitioner has not borne her burden of establishing entitlement to injunctive relief.

### III.   CONCLUSION

Accordingly, for the foregoing reasons,

IT IS ORDERED that Petitioner's motion for preliminary injunction (R. Doc. 2) is DENIED.

IT IS FURTHER ORDERED that the TRO is dissolved.

IT IS FURTHER ORDERED that this case is DISMISSED for lack of subject-matter jurisdiction.

New Orleans, Louisiana, this 24th day of February, 2025.

_____
BARRY W. ASHE
UNITED STATES DISTRICT JUDGE